# CIRCUIT COURT OF LOUDOUN COUNTY

Stoneleigh Group, Inc.

v.

Town of Round Hill et al.

April 23, 1999

Case No. (Chancery) 18434

BY JUDGE JAMES H. CHAMBLIN

This suit for a declaratory judgment and injunctive relief for a breach of contract was tried before me without a jury on April 14, 15, and 16, 1999. The suit involves the obligation of the Town of Round Hill to provide sewer taps to serve sixteen lots owned by the Stoneleigh Group, Inc., in a subdivision outside the corporate limits of the Town.

After consideration of the evidence and the argument of counsel, I find and rule as follows.

As I ruled when I partially granted the Motion to Strike of the Town at the conclusion of the evidence of the Stoneleigh Group, the Agreement dated January 21, 1988, between Fort Beauregard Associates, Inc. (the prior name of the Stoneleigh Group) and the Town had expired because there was no evidence that either party intended for the Agreement to be extended beyond January 21, 1994, when it expired by its own terms. Accordingly, neither party has any right or obligations under the Agreement.

The letters provided by the Town for the benefit of Loudoun County (because the subject properties are located in the County, all land development approvals were required to be obtained from the County), which the Stoneleigh Group refers to as the "will serve letters," concerning sewer and water service by the Town of Stoneleigh Subdivision and Fallswood Subdivision do not create a contract requiring the Town to provide such services to the subdivisions, except for the several letters that specifically grant

or approve services for specific lots. No letter grants specific approval for any of the subject sixteen lots. The letters merely show the intention of the Town to provide utility services in the two subdivisions. The letters are, however, one factor causing the finding and ruling below.

The facts and circumstances of this case show that the Town does actually provide sewer service to the two subdivisions which are outside the corporate limits of the Town. Therefore, the "holding out" exception to the general rule that a municipality has no duty to provide sewer service outside its territorial limits applies to the Town.

Because the Town "holds itself out" to provide sewer service to the two subdivisions, it is treated as a public utility for purposes of servicing that area. Under the exception, the Town can deny service to properties in that area only for "utility-related" reasons, including lack of capacity.

I find the "holding out" exception to be as described in *Town of Rocky Mount v. Wenco of Danville*, 256 Va. 316, 321 (1998). I do not construe *Rocky Mount* as a ruling that the "holding out" exception does not or will never apply in Virginia. The Supreme Court merely ruled that the petitioner Wenco did not establish sufficient facts to qualify for consideration under the exception.

The evidence presented by the Stoneleigh Group and the Town as to the operation of the sewer plant before, during, and after April 1998 is conflicting on the issue of the problems in its operation. The circumstances in April 1998 created a reasonable basis for the Town, which has discretion in the operation (a proprietary function) of its sewer plant, to prohibit any further taps. In other words, the Town had a "utility-based" reason to deny all the sewer tap requests, including the sixteen taps requested by the Stoneleigh Group. However, the action of the Town on June 4, 1998, when it agreed to grant taps to twenty-two lots in the two subdivisions, none of which lots were owned by the Stoneleigh Group, upon the presentation of a building permit discriminated against the Stoneleigh Group; there is no "utility-based" reason for the discrimination.

The Stoneleigh Group should not have been treated differently from the other individual lot owners in Stoneleigh and Fallswood. The remedy is to require the Town to treat the sixteen lots owned by the Stoneleigh Group in Stoneleigh the same as the twenty-two lots included in the resolution adopted by the Town Council on June 4, 1998. The Town had a "utility-based" reason for allowing individuals to connect to the sewer system if they were building, as opposed to those who were not building on a lot. The Town had, and still has, a severe problem because of contractually committed capacity in the plant. Therefore, the Town is enjoined from treating a request from the

Stoneleigh Group, or any successor in interest to it, for a sewer tap for any one of the sixteen lots in Stoneleigh listed in the Joint Stipulations of Fact any differently than it would treat a request from an owner of one of the twenty-two lots covered by the resolution adopted on June 4, 1998.

## Findings of Facts

In the late 1980s, Fort Beauregard Associates, Inc., acquired approximately 700 acres of land in rural western Loudoun County just outside the corporate limits of the Town. The Town has operated a water and sewer system serving properties inside and outside its corporate limits since the mid 1970s. Fort Beauregard intended to develop the land into a residential subdivision of 170 three-acre lots surrounding a golf and country club. Because the land is in the County, all permits, special exceptions, and subdivision approvals had to be obtained from the County. Because of poor percolation, Fort Beauregard needed water and septic service for the lots. At the same time, the Town was experiencing problems with its municipal water system. Due to contaminated wells, the Town had a moratorium on water taps. Fort Beauregard and the Town entered into an agreement dated January 21, 1988, by which Fort Beauregard constructed a water supply, storage, and transmission system complying with all applicable regulations to serve the development which it called Stoneleigh. The wells, transmission lines, and other facilities were constructed by Fort Beauregard at a cost in the millions of dollars. The facilities were later transferred in stages to the Town to become a part of its water system. Under the 1988 Agreement, Fort Beauregard acquired the right to purchase 130 sewer taps, and the Town agreed to reserve capacity for the 130 taps in its sewage treatment plant for six years. Fort Beauregard was to prepay the sewer tap fees within 30 days of final plat approval. Also under this Agreement, Fort Beauregard acquired 150 water taps for its development.

The Town's sewer treatment plant was constructed on land outside the town limits in the mid 1970s pursuant to an agreement it made with Mr. and Mrs. C. E. Eckles in October 1974. The plant is still in operation and has not been expanded since it was originally constructed. From its original construction, the plant has served land inside and outside the town limits. From its inception, the Town sewer system depended upon out of town users to support it.

The Town sewer plant has a permitted capacity of 200,000 gallons per day (gpd). Under the Eckles' Agreement, the Town is required to make available 100,000 gpd for use of the property owned in 1974 by the Eckles just east of the corporate limits of the Town. In a "Clarification of Agreement" between

the Eckles and the Town in June 1975, it was agreed that such capacity was reserved and guaranteed to the Eckles and that the Town, if it so elects, can use for its own purposes the entire 200,000 gpd, but if it does so, then the Town must be prepared at its expense to take all steps necessary to assure the capacity reserved to the Eckles. The Eckles' Agreement inured to the benefit of the subsequent owners of their property. This property is now being developed.

The Town has always taken the position that it is committed under the Eckles' Agreement to reserve 100,000 gpd of capacity in the plant for the benefit of the former Eckles' property.

Due to an economic downturn, Fort Beauregard decided in 1990 to develop initially only 51 lots instead of the planned 170 lots in Stoneleigh. Bruce Brownell, president of the Stoneleigh Group, testified that he negotiated initially for 130 sewer taps, even though the development contemplated developing 170 lots, believing that the Town had the sewer capacity to provide the additional 40 taps when they would be needed. In October 1990, Fort Beauregard and the Town amended the 1988 Agreement to provide that Fort Beauregard need pay for sewer taps for only the fifty-one lots initially approved by the County and that it would diligently pursue approval from the County for the remaining seventy-nine lots (presumably for the remaining 79 of the initial 130 sewer taps). Fort Beauregard did pay the Town for the fifty-one sewer taps pursuant to the amendment.

In July 1989, Fort Beauregard acquired approximately fifteen acres from Frank and Carolyn Beers adjacent to the Stoneleigh Subdivision. All or part of this acreage was combined with a portion of the Stoneleigh property to create Fallswood Subdivision, a subdivision ultimately approved for forty-four lots. Fallswood is adjacent on the east to Stoneleigh, and, like Stoneleigh, is outside the Town's limits.

In January 1990, the County adopted the Round Hill Area Management Plan (RHAMP), which is a land use plan for the area surrounding the Town. The RHAMP is discussed further in the Legal Analysis portion of this opinion.

By 1991, Fort Beauregard had constructed the water system facilities for the final phase of Stoneleigh. The facilities were accepted by the Town. From 1990 to 1994, the first phase of Stoneleigh was developed.

By 1994, Fort Beauregard had changed its name to the Stoneleigh Group. The first section of the second phase of Stoneleigh was recorded in 1994. In order for the plat for this section to be recorded, the County required evidence of water and sewer service by the Town. At the County's request, the Town provided a letter dated March 18, 1994, which read as follows:

> Please be advised that the Town of Round Hill has approved the extension of public utilities to Phase II of the Stoneleigh subdivision. The Town of Round Hill water and sewer systems presently have capacity to serve this development, and the Town has not issued or is not considering a utility moratorium.

As further sections of Phase II of Stoneleigh and Fallswood were developed, the Town provided similar letters for the County. Most of the letters recited that it was the "intention" of the Town to provide sewer and water to the various sections of Phase II. However, on several occasions, the Town did specifically agree to provide water and sewer service to various lots in the Fallswood Subdivision.

In Phase II of Stoneleigh, the utilities were put in place by the Stoneleigh Group and accepted by the Town in increments over a period of four to five years. The utilities were substantially completed by 1996.

In late 1996, Mr. Brownell became aware that the Town was having problems with the sewer plant and that the Town was considering not granting any further out of town sewer taps. The sewer plant was having infiltration (seeping of ground water into the sewer system) and inflow (surface water finding its way into the sewer system) problems. By 1998, the operator of the plant was noticing and reporting to the Town Council that although the plant had a permitted capacity of 200,000 gpd, the quality of the effluent decreased as the flow exceeded 70,000 to 80,000 gpd. There was no evidence that when the quality of the effluent decreased, it violated any law or regulation or created a health hazard.

The operator of the plant felt that it had a design problem that prevented it from operating efficiently when the flow exceeded 70,000 to 80,000 gpd. The Town offered expert evidence to support this contention. On the other hand, the Stoneleigh Group offered expert evidence that the sewer plant's problems were caused by the way it was, and is, being operated. The infiltration and inflow problem contributed to the plant's operational problems. The Stoneleigh Group, the Town, and at least one other developer have spent a considerable amount of money toward remedying the infiltration and inflow problem.

By April 1998, over 130 sewer taps had been issued for Stoneleigh and Fallswood.

On April 2, 1998, the Town Council considered requests from the Stoneleigh Group for sixteen sewer taps in Stoneleigh, as well as requests for sewer taps from three individual lot owners in Stoneleigh and one individual lot owner in Fallswood. Considering the problems with the sewer plant, the

Town Council denied all the sewer tap requests. It was also mentioned during the meeting that the Stoneleigh Group had already received its "quota" of 130 sewer taps (presumably, the 130 sewer taps which were the subject of the 1988 Agreement). Further, the Town Council was aware that plans were being developed and reviewed for the expansion of the sewer plant with an anticipated completion within a couple of years.

Mayor Stephen Kuehm testified that he had calculated that the Town had a committed capacity in the sewer plant as of April 1998 of 208,000 gpd. Although he did not explain in detail his calculations, it is clear that he considered the 100,000 gpd capacity reserved under the Eckles' Agreement and the capacity to serve potentially developable but unimproved land within the town limits in calculating the committed capacity of the sewer plant. His calculations were made known to the Town Council when it voted.

The minutes of the April 2, 1998, meeting include references to the sewer plant's being over-allocated and the infiltration and inflow problem.

At its meeting on April 16, 1998, the Town Council again considered sewer tap requests for Stoneleigh and Fallswood lot owners. Requests had been received for four sewer taps in addition to the ones requested at the April 2 meeting. At this meeting, Mayor Kuehm again demonstrated that his calculations show the plant to be over-allocated. He discussed the ongoing plan to expand the plant. The Town Council voted 2 to 2 on a motion to deny the additional requests. Under the Town procedure, the Mayor casts the deciding vote in the event of a tie. Mayor Kuehm voted in favor of the motion, and the additional sewer tap requests were denied.

After the meeting of April 2, 1998, lot owners in the two subdivisions called the Town about sewer taps. Two or three lot owners indicated that they were building homes on their lots and needed a sewer tap.

On June 4, 1998, the Town Council reconsidered the sewer tap situation in Stoneleigh and Fallswood and passed a resolution which reads in pertinent part as follows:

> Now, therefore be it resolved, that the Town of Round Hill provide sewer availability to those twenty-one (21) lots within the subdivision known as Stoneleigh which have heretofore been sold by the developer. The Stoneleigh Group, Inc., and one (1) lot sold within the subdivision known as Fallswood which has heretofore been sold by the developer, Fallswood Development Corporation. These availabilities are allocated to these lots only and may not be assigned; however, the owners of these lots need not apply immediately to reserve the availability but only need to provide the Town with a copy

of their building permit issued by the County of Loudoun. [The] lots approved for sewer availability are as follows:

Stoneleigh: Lots 25A, 51, 52, 54, 60, 65, 66, 71B, 72, 73, 75, 107, 121, 123, 127, 131, 133, 134, 135, 138, and 139

Fallswood: Lot 9

Be it further resolved, that no additional sewer taps will be granted at this time under any condition until capacity is made available at the Sewer Plant. At such time, sewer taps may be available to appropriate properties on a first come, first serve basis. No taps will be reserved.

By the time of trial, the Town had sold sewer taps to serve nine of the twenty-two lots mentioned in the June 4, 1998, resolution.

Although the experts disagreed, neither party offered any evidence that the operational problems with the sewer plant are, or ever have been, a safety or health hazard. No one testified that the plant could not, in April 1998 or today, handle the sixteen taps requested by the Stoneleigh Group in addition to the twenty-two taps authorized by the resolution of June 4, 1998. Other than one minor violation (a low battery in a testing instrument), the sewer plant has never received any citations from the Virginia Department of Environmental Quality or any other regulatory agency.

The Stoneleigh Group does not assert that it is entitled to the sixteen sewer taps under the 1988 Agreement. It does not challenge the Town's position that the Stoneleigh Group has acquired all the 130 sewer taps due it under the 1988 Agreement.

There is no argument from the Stoneleigh Group that it is entitled to the sixteen sewer taps because the 1988 Agreement only concerned Stoneleigh subdivision. Both Stoneleigh and Fallswood subdivisions are considered as developments covered by the 1988 Agreement.

During closing argument, the Stoneleigh Group abandoned its claim for twelve sewer taps for an unrecorded and undeveloped portion of Stoneleigh which does not have sewer lines installed.

## Legal Analysis

Just as Wenco of Danville did in *Rocky Mount*, the argument of Stoneleigh Group, in this case, is based on the "holding out" exception to the general rule that a municipality has no duty to furnish sewer service to users outside of its territorial limits. Under the exception, a municipal corporation that "holds itself out" as providing sewer services to a given area outside its territorial limits will be treated as a public utility for purposes of serving that area. Such a municipal corporation may deny service to properties within the

given area only for "utility-related" reasons, including lack of capacity. *Rocky Mount*, 256 Va. at 321.

The exception applies only upon proof of either of the following:

(1) an agreement by the municipality to provide utility service to a general service area; or

(2) the actual provision of service to a number of properties in a given area manifesting the consent of the municipality to provide services to a given area as a public utility.

*See* 11 Eugene McQuillin, *The Law of Municipal Corporations*, § 31.16 (1991 and 1997 Supp.).

I realize that the Supreme Court did not in *Rocky Mount* adopt the "holding out" exception. However, it did not find that the exception does not apply in Virginia. The Supreme Court merely stated the "under the facts presented here, we need not consider whether the 'holding out' exception should be adopted in Virginia." *Rocky Mount*, 256 Va. at 321.

I have considered the non-Virginia cases cited in *Rocky Mount* concerning the "holding out" exception. Each case is fact-specific, but each does recognize that the exception can exist with the appropriate circumstances. The exception is very reasonable and just plain "makes sense." If a municipality undertakes to provide utility services in a given area outside its corporate limits, then it should be held to the same standard as it would be held in providing such services within its corporate limits.

The Town has cited Virginia Code § 56-232, which exempts a municipality from the definition of a public utility, as a reason for the "holding out" exception not being adopted in Virginia. I do not agree. The statute is not referred to in *Rocky Mount*. This statute merely exempts municipalities from public utility regulation by the State Corporation Commission. The statute does not mean that a town cannot operate a public utility.

If there ever exists a case for the application of the "holding-out" exception in Virginia, then this is the case. Ever since its inception in the 1970s, the Town's water and sewer system has served out of town properties. Former mayor Jeffrey Wolford testified unequivocally that the Town, because of its small size, needed the revenue from servicing out of town properties to meet the operational costs and debt service on the system. The Town's own evidence shows that over 60% of the properties served (either actually connected or tap prepaid) by the system are outside of the Town.

The Town's desire and need to serve out of town properties is further supported by the adoption of the RHAMP in 1990 by the County. Under the RHAMP, the County relies on the Town to be the sole provider of water and sewer services in the Urban Growth Area (UGA) of the RHAMP. Both

Stoneleigh and Fallswood are located in the UGA. The Town participated in the development of the RHAMP by the County and supported its adoption by the County.

I cannot find that the Town specifically agreed to provide water and sewer service in the two subdivisions. However, the 1988 Agreement and its performance, whereby the Town secured an acceptable water supply for all its service area (in and out of Town) and acceptable water lines serving the two subdivisions, coupled with the letters requested by the County from the Town concerning water and sewer service to the two subdivisions, show the intention of the Town to serve the lots in both subdivisions. Moreover, the Town has water and sewer lines in front of all the developed lots in each subdivision. It has either actually connected or sold taps for 100 lots in Stoneleigh and 44 lots in Fallswood. Clearly, the Town actually provides water and sewer service to the recorded and developed lots in Stoneleigh and Fallswood.

I find that the "holding out" exception does apply to the Town with respect to the Stoneleigh and Fallswood subdivisions. I decline to find that the exception applies to the UGA of the RHAMP.

Next, I must consider whether the Town had a "utility-based" reason to deny the request of the Stoneleigh Group for sixteen sewer taps in Stoneleigh in April 1998. Lack of capacity can be a "utility-based" reason. *Rocky Mount*, 256 Va. at 321. The provision of utility service by the Town outside its corporate limits is a proprietary function, and, in the performance of such a function, the Town can consider factors of corporate benefit and pecuniary profit. It has discretion in providing services, but it cannot discriminate in providing services unless the reason is "utility-based."

After consideration of all the circumstances in April 1998 as they were known to the Town Council, I find that it had a "utility-based" reason to deny all sewer tap requests at that time. There were problems at the plant, and plans were underway to expand the plant to remedy the problems. There may have been arguments on both sides of the issue, but I find that the Town Council had the discretion in April 1998 to deny all requests for sewer taps. Such a position would be consistent with a desire to preserve the health and safety of the people in the Town's service area until the problems with the plant were remedied and would not have been an abuse of discretion.

Such a position could only be manifested by a total ban on new sewer taps. The Town did not continue in this position when it decided on June 4, 1998, to sell sewer taps to serve lots owned by persons other than the Stoneleigh Group who had acquired a permit to build on a lot. There is no evidence that the problems with the sewer plant improved by June 1998.

In allowing individuals with building permits to acquire a sewer tap, the Town has recognized that as many as twenty-two additional users could be added to the system without creating any additional problems at the sewer plant. The Town offered no evidence to show why these twenty-two potential sewer taps are not a problem while a total of thirty-eight taps including the sixteen taps requested by the Stoneleigh Group would create a problem.

The justification offered by the Town Council is that the denial of a sewer tap to a person who bought a lot from the Stoneleigh Group, which in the opinion of the Town Council did nothing to assure the purchaser from it of a lot in Stoneleigh that the lot had a sewer tap, would create an undue economic hardship on that purchaser. The lot would be essentially worthless without a sewer tap. The Town Council felt that it has some sort of moral duty to help out these "innocent" purchasers.

The Town offered no evidence that the Council was aware in June 1998 of all the circumstances under which all the individuals owning the lots covered by the resolution came to acquire their lots. The only thing that the Council members knew for sure was that the twenty-two lots covered by the resolution were not owned by the Stoneleigh Group even though the Stoneleigh Group had sixteen lots with water and sewer lines in front of them just like the twenty-two individually owned lots.

I find that the Town did more than just differentiate between the sixteen lots and the twenty-two lots. It discriminated without a "utility-based" reason against the Stoneleigh Group in adopting the resolution of June 4, 1998.

The remedy is not to require the Town to grant outright the sixteen sewer taps to the Stoneleigh Group. To do so would discriminate against the individual lot owners. Therefore, the remedy is to require the Town to treat the request for sewer taps for sixteen lots in Stoneleigh owned by the Stoneleigh Group exactly the same as the Town decided to treat a request for a tap to serve one of the twenty-two lots covered by the June 4, 1998, resolution.

I cannot find from the evidence presented that allowing a total of thirty-eight sewer taps to be added to the Town's sewer system would create any health or safety problems. The operator of the plant never recommended that the Town suspend sewer tap sales, and he testified that a decision about capacity or the sale of additional taps is a political decision. If the addition of the sixteen taps to the system creates a health or safety problem or overtaxes the plant, then I feel that the Town would have offered evidence of it. The Town did not do so.

The remedy granted to the Stoneleigh Group is as set forth at the beginning of this opinion.